UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
TYSON POULOS,

                             Plaintiffs,

        -against-

COUNTY OF WARREN; WARREN COUNTY
SHERIFF'S DEPARTMENT; CORRECTIONS
OFFICER DUSTIN SPRING, in his individual and
official capacities; CORRECTIONS OFFICER
CHARLENE MADAY, in her individual and official
capacities; CORRECTIONS OFFICER MATTHEW
HUBBARD, in his individual and official capacities;
CORRECTIONS OFFICER CHRISTOPHER PERILLI,
in his individual and official capacities; SERGEANT
BARRETT SPRING, in his individual and official
capacities;  INVESTIGATOR CHRISTOPHER HATIN,
in his individual and official capacities; WARREN
COUNTY DISTRICT ATTORNEY'S OFFICE; and
ASSISTANT DISTRICT ATTORNEY MATTHEW
BURIN, in his individual and official capacities,

                           Defendants.
----------------------------------------------------------------------X

21 Civ. 00096 (MAD) (CFH)

**AMENDED COMPLAINT**

<u>Jury Trial Demanded</u>

       Plaintiff, complaining of the defendants by his attorneys, **HELD & HINES, LLP,** respectfully alleges as follows, upon information and belief:

<u>**JURISDICTION AND VENUE**</u>

       1.    This action is brought, *inter alia*, for violations of 42 U.S.C. §1983 in that Defendants, acting individually and in concert, under color of law, caused Plaintiff's false imprisonment and malicious prosecution, depriving him of rights, privileges and immunities secured by the Federal Constitution, including the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments, and the laws of the United States. This action is also brought under 42 U.S.C. §1988 for the recovery of attorney's fees.

2.      Jurisdiction of the District Court is appropriate, pursuant to 42 U.S.C. §1331, in that this Complaint seeks to remedy violations of civil rights pursuant to 42 U.S.C. §1983 and 1988, as well as the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the Federal Constitution, and pursuant to 42 U.S.C. §1332, in that the amount of damages sought exceeds $75,000.

3.      Venue in the Northern District is appropriate pursuant to 42 U.S.C. §1391, in that a substantial part of the events giving rise to this claim occurred within Warren County, New York, which is within this Judicial district.

## THE PARTIES

4.      At all times hereinafter mentioned, Plaintiff TYSON POULOS was and is a resident of the State of New York.

5.      At all times hereinafter mentioned, Defendant COUNTY OF WARREN (hereinafter "COUNTY") was and is a municipal corporation, existing by virtue of the laws of the State of New York.

6.      At all times hereinafter mentioned, Defendant WARREN COUNTY SHERIFF'S DEPARTMENT (hereinafter "SHERIFF") was and is an agency and/or department and/or division of Defendant COUNTY and operates under the supervision, maintenance and control of Defendant COUNTY.

7.      At all times hereinafter mentioned, Defendant CORRECTIONS OFFICER DUSTIN SPRING (hereinafter "CO SPRING") was a corrections officer employed by Defendant COUNTY and by SHERIFF.

8.     At all times hereinafter mentioned, Defendant CORRECTIONS OFFICER CHARLENE MADAY (a/k/a CHARLENE WELLS) (hereinafter "MADAY") was a corrections officer employed by Defendant COUNTY and by SHERIFF.

9.     At all times hereinafter mentioned, Defendant CORRECTIONS OFFICER MATTHEW HUBBARD (hereinafter "HUBBARD") was a corrections officer employed by Defendant COUNTY and by SHERIFF.

10.     At all times hereinafter mentioned, Defendant CORRECTIONS OFFICER CHRISTOPHER PERILLI (hereinafter "PERILLI") was a corrections officer employed by Defendant COUNTY and by SHERIFF.

11.     At all times hereinafter mentioned, Defendant SERGEANT BARRETT SPRING (hereinafter "SGT. SPRING") was a corrections officer employed by Defendant COUNTY and by SHERIFF.

12.     At all times hereinafter mentioned, Defendant INVESTIGATOR CHRISTOPHER HATIN (hereinafter "HATIN") was and is an investigator employed by Defendant COUNTY and by SHERIFF.

13.     At all times hereinafter mentioned, Defendant WARREN COUNTY DISTRICT ATTORNEY'S OFFICE (hereinafter "DAO") was and is an agency and/or department and/or division of Defendant COUNTY and operates under the supervision, maintenance and control of Defendant COUNTY, with independent policy-making powers.

14.     At all times hereinafter mentioned, the DAO was and remains under the supervision and control of the Warren County District Attorney,[1] who acts and functions as an independent policy-maker for the Defendant County.[2]

15.     At all times hereinafter mentioned, Defendant ASSISTANT DISTRICT ATTORNEY MATTHEW BURIN (hereinafter "BURIN") was and is an assistant district attorney employed by Defendant COUNTY and by DAO.

## FACTUAL BACKGROUND

16.     At all times alleged herein, Defendants, individually and collectively, engaged in the alleged misconduct while acting under color of law.

17.     At all times alleged herein, Defendants, individually and collectively, knowingly, willingly and with malicious intent, participated in, acquiesced to, were complicit in, contributed to, encouraged, importuned, authorized, contrived, conspired, approved, and/or were deliberately indifferent to the misconduct alleged, thereby depriving Plaintiff of his clearly established Constitutional rights.

18.     On or about the morning of January 20, 2014, in the town of Queensbury, New York, at the Budget Inn Motel, members of the Warren County Sheriff's Department and its Narcotics Enforcement Unit pretextually arrested Plaintiff on an unrelated, invalid, 4-year-old misdemeanor arrest warrant.

19.     Said room was rented to Nouf Taraman, a female acquaintance of Plaintiff.

20.     Plaintiff was removed from the room by the arresting officers.

---

[1] Kathleen Hogan was the Warren County District Attorney from 2002 to 2017, at which time Jason Carusone inherited the office and has remained the Warren County District Attorney ever since.
[2] *See, e.g., Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992).

21.    The officers then entered the motel room without Ms. Taraman's consent and conducted a warrantless search.

22.    A quantity of drugs belonging to Ms. Taraman was found.

23.    Ms. Taraman was released from police custody but Plaintiff was arrested for the alleged possession of drugs.

24.    The officers at the scene would knowingly and falsely later claim that Ms. Taraman waved them into her motel room, that she provided verbal and written consent to search, and that the search of her motel room did not commence until after a written consent had been signed.

25.    The officers manipulated their collection of evidence with malicious intent to support the appearance and assumption of Plaintiff's guilt.

26.    Plaintiff was arraigned on drug charges. He demanded a probable cause hearing and requested to testify on his own behalf at the Grand Jury. He voiced complaint on the record in Court detailing the aforesaid unlawful behavior of the officers.

27.    Plaintiff was threatened and harassed by Sheriff's Department Investigators Terry Comeau and Anthony Bruno for demanding his probable cause hearing and requesting to testify at the Grand Jury.

28.    Plaintiff was incarcerated at the Warren County Jail pending trial.

29.    Although Plaintiff was not suicidal, he was placed on "suicide watch" in the B-Pod area, due to, upon information and belief, a featherbedding scheme designed to ensure the hiring and/or retention of unneeded corrections officers. The "suicide watch" required an officer to be posted directly in front of Plaintiff's cell at all times, while recording all of Plaintiff's physical movements in a real-time Constant Watch logbook.

30.     A Grand Jury was convened on the drug possession charges on or about January 24, 2014.

31.     On or about January 22, 2014, DAO and Defendant BURIN were served with a formal notice that Plaintiff wished to testify on his own behalf at the Grand Jury proceeding.

32.     Upon information and belief, SHERIFF, DAO and Defendant BURIN possessed text messages demonstrating that the drugs Plaintiff had been accused of possessing actually belonged to Ms. Taraman. The drugs were found in Ms. Taraman's motel room after Plaintiff had been removed but while Ms. Taraman was still in it.

33.     Recorded jail telephone calls between Ms. Taraman and Plaintiff from on or about January 23, 2014 indicated that Ms. Taraman began receiving threatening calls from DAO on or about January 22, 2014, to change her story by incriminating Plaintiff, or else she would also be arrested and indicted. She refused.

34.     Upon information and belief, a plan was devised between SHERIFF, DAO and Defendant BURIN to harass, abuse, and punish Plaintiff and entrap him for new felony charges at the Warren County Jail on or about January 23, 2014, one day in advance of his scheduled testimony at the Grand Jury on January 24, 2014.

35.     A pattern of orchestrated harassment and abuse against Plaintiff ensued, calculated to deprive Plaintiff of sleep. On or about the night of January 22, 2014, every time Plaintiff would fall asleep, the officer posted directly outside of his cell pursuant to the "suicide watch" would knock on his cell door, harass him, and wake him back up.

36.     At approximately 1:35 AM on January 23, 2014, corrections officers maliciously seized Plaintiff's sheets because he had them *under* his head and was using them as a pillow,

alleging that this was a rule violation, even though no such rule was promulgated in the Warren County Jail Inmate rulebook.

37.   Upon information and belief, corrections staff then turned on the fan to push cold air into Plaintiff's cell, causing frigidly cold air to enter Plaintiff's cell in the middle of January. Upon information and belief, Plaintiff's cell was not insulated, and Plaintiff was not provided with a long-sleeved shirt to protect himself.

38.   At approximately 9:14 AM on January 23, 2014, Defendant PERILLI entered the B-Pod housing unit and, with premeditated, sadistic and malicious intent, seized Plaintiff's blanket without justification, so that Plaintiff, who was only wearing a short-sleeved T-shirt, would not be able to cover himself, leaving him directly exposed to the frigidly cold air entering his cell.

39.   Defendant PERILLI would intentionally and falsely claim that Plaintiff was covering his head with the blanket, thereby committing a rule violation.

40.   Upon information and belief, the corrections officers were using the cold air as a tactic to incite an adverse reaction from Plaintiff, which they could then use as a pretext to fabricate new charges and have him isolated to solitary confinement.

41.   Plaintiff began to plead with Defendants PERILLI and SGT. SPRING to stop torturing him with the cold air, to no avail.

42.   Defendant SGT. SPRING refused to give Plaintiff his blanket, even though Plaintiff denied that he had been using it to cover his head when Defendant PERILLI had taken it, and even though he repeatedly assured Defendant SGT. SPRING that he would not use it to cover his head, but that he only wanted it for protection from the excruciatingly cold air that was relentlessly being pumped into his cell.

43.    Defendant SGT. SPRING also refused to take the temperature in Plaintiff's cell, even though he later testified at Plaintiff's retrial that he could have done so.

44.    In a desperate attempt to be removed from the freezing cell, Plaintiff clogged his toilet and flooded the cell.

45.    Defendant SGT. SPRING then turned the water off in Plaintiff's cell, and stated, "You're really gonna freeze your ass off in there now, boy."

46.    Plaintiff had been unable to use the bathroom for the preceding three days because corrections officers posted directly in front of his cell incessantly stared at him. After the water had been turned off, he began to have abdominal cramps and pain. Plaintiff could no longer withstand not using the bathroom, and he eventually informed Defendant PERILLI that he had to use the bathroom, to which PERILLI replied "tough shit, you shouldn't have clogged your toilet." Plaintiff then informed PERILLI that he would be forced to go to the bathroom on the floor.

47.    Plaintiff ultimately went to the bathroom on the floor of the flooded cell. Defendant SGT. SPRING then returned to Plaintiff's cell, informed him that he was going to charge him with a felony, and removed Plaintiff from his freezing cell to a slightly warmer cell in the jail's booking office.

48.    The captain at the jail walked over to Defendant HATIN's office at the adjoining SHERIFF's department and requested that felony charges be filed against Plaintiff for aggravated harassment of an employee by an inmate. Plaintiff's B-Pod cell was then sealed off and preserved as a crime scene so that Defendant HATIN could photograph feces on the floor of the cell, even though HATIN later admitted that he determined no crime had been committed in the B-Pod cell.

49.    At 11:13 AM on January 23, 2014, Plaintiff was moved to the Linear-A housing area and placed in solitary confinement in an even colder cell, again without a blanket, due to

Defendant PERILLI's false accusation earlier in the day that Plaintiff had allegedly been using it to cover his head.

50.     Defendant HUBBARD was posted directly in front of Plaintiff's Linear-A cell to conduct the suicide watch at this time, keeping a real-time Constant Watch logbook, which he later testified was for the purposes of recording all of Plaintiff's movements and "anything out of the ordinary" that occurred.

51.     Defendant CO SPRING, the housing unit officer, was also present at this time.

52.     At this time Plaintiff was in an empty cell with no blanket or sheets, wearing only a T-shirt and short-sleeved jumpsuit with no shoes or socks, with frigidly cold air entering his cell from the air vent in the ceiling, which was connected to an uninsulated concrete wall which had a waist-high pile of ice and snow on the other side.

53.     Plaintiff began to feel as though he was locked in a freezer. Plaintiff once again pleaded with Defendants SGT. SPRING, CO SPRING and HUBBARD to stop the flow of cold air into his cell, to no avail. These Defendants knew Plaintiff was desperately cold but continued to deny him the blanket or a long-sleeved shirt, while other inmates in nearby cells were wearing sweatshirts, were wrapped in blankets, and were wearing socks on their hands as mittens; Plaintiff, by contrast, didn't even have socks on his feet.

54.     In sheer desperation, Plaintiff again flooded the cell and minimally went to the bathroom on the floor of the cell, since this was what won him the brief respite from the cold air earlier in the day.

55.     After this occurrence in the Linear-A cell, Defendant CO SPRING stated, "hardly deserving of your new felonies Poulos," demonstrating that a premeditated conspiracy to frame

Plaintiff for allegedly kicking a mixture of urine and feces onto Defendants CO SPRING and MADAY (a/k/a CHARLENE WELLS) (which Plaintiff never did) was already underway.

56.     Plaintiff also began cutting his wrist on the desk inside of his cell, not due to any intention of self-harm but rather in the hope of being removed from the freezing cell.

57.     Defendants SGT. SPRING, CO SPRING and MADAY (a/k/a CHARLENE WELLS) entered Plaintiff's cell, threatening to pepper spray him if he didn't stop cutting his wrist on the desk. Defendant HUBBARD was still posted directly in front of Plaintiff's cell, conducting the suicide watch with the Constant Watch logbook.

58.     The above Defendants exited Plaintiff's cell and closed the door without further incident, though they would later falsify documents, reports and testimony initially alleging, *inter alia,* that *after* they exited the cell and closed the door, Plaintiff kicked a mixture of his feces, urine and toilet water out from underneath the closed cell door and up onto the clothing of Defendants MADAY (a/k/a CHARLENE WELLS) and CO SPRING, who were both standing on the opposite side of the closed cell door.

59.     Plaintiff was not wearing shoes or socks when he was alleged to have kicked this material. The gap beneath the non-porous door was very narrow, though Defendant MADAY (a/k/a CHARLENE WELLS) alleged that Plaintiff kicked the material out from underneath the small gap at the bottom of the door, and that it went all the way up to her knees and soaked her pant legs.

60.     These Defendants alleged that Plaintiff kicked the material with his left leg, although Plaintiff is right-handed and uncoordinated in the left side of his body and would not have been naturally inclined to kick with his left leg. In spite of the foregoing, Defendant HUBBARD changed his story and claimed that Plaintiff kicked the material with his right leg at

Plaintiff's retrial, in contravention of his previous sworn testimony about this incident, and the other officers' testimony.

61.     Defendant HUBBARD, who was conducting the constant watch of Plaintiff, failed to make any mention of the purported kicking and assaulting of fellow officers with urine and feces in the real-time Constant Watch logbook, or in any of the other three intra-agency reports that he authored about the incident later that day. Upon information and belief, HUBBARD was an unwilling participant in the conspiracy to trump up charges against the Plaintiff but was pressured into doing so by SHERIFF and DAO. He was promoted to the rank of sergeant one week before he was set to give false testimony at Plaintiff's August 2014 trial.

62.     Although Defendant HATIN arrived at the scene no more 18 minutes after the alleged kicking and soiling of Defendant MADAY's (a/k/a CHARLENE WELLS) and CO SPRING's garments, MADAY falsely alleged that she and CO SPRING both laundered their garments, which were allegedly "soaked" with Plaintiff's urine and feces, before the investigator arrived, although CO SPRING would later author a "Victim Impact Statement" falsely claiming that he was forced to finish his shift and go home wearing socks allegedly "soaked" with Plaintiff's urine and feces; the allegedly soaked socks were never preserved. This is despite the fact that Defendant SGT. SPRING (CO SPRING's brother) testified at the re-trial that there were hundreds of pairs of clean, new socks in the jail's booking office at the time.

63.     Defendants MADAY (a/k/a CHARLENE WELLS) and CO SPRING, longtime employees of SHERIFF, were both trained in evidence preservation.

64.     Defendant MADAY (a/k/a CHARLENE WELLS) was very familiar with evidence preservation and law-enforcement procedures, since her father, John Maday, is a longtime criminal investigator at SHERIFF, and her uncle, Captain Albert Maday, runs the Warren County Jail.

65.     Defendant HATIN, a close friend of Defendant MADAY (a/k/a CHARLENE WELLS)'s father, never requested that MADAY (a/k/a CHARLENE WELLS)'s and CO SPRING's allegedly soiled clothing be preserved as evidence, nor did Defendant SGT. SPRING, who was the shift Supervisor at the jail that day and the highest-ranking officer involved in the incident, and CO SPRING's brother.

66.     There never were any soiled garments. Defendant MADAY (a/k/a CHARLENE WELLS)'s and CO SPRING's unsoiled garments, which they were both still wearing at the time Defendant HATIN arrived on the scene no more than 18 minutes later, constituted exculpatory evidence which should have been but were not preserved.

67.     Defendant MADAY (a/k/a CHARLENE WELLS) arrived in Linear A to relieve Defendant CO SPRING for his lunch break at 12:30 PM. The alleged kicking incident was said to have occurred at 12:34 PM. Defendant HATIN arrived at the scene by 12:52 PM. MADAY (a/k/a CHARLENE WELLS), having to remain in the Linear-A housing unit to watch the inmates, would not have been able to launder her allegedly soiled clothing during that short 18-minute window.

68.     Defendant HATIN never attempted to preserve the officers' unsoiled clothing, nor the exculpatory video evidence of Defendants MADAY (a/k/a CHARLENE WELLS) and CO SPRING during the 18-minute interval, which showed that they were never wearing soiled garments and thus they were both lying. Instead, Defendant HATIN cherry-picked which evidence to preserve, for example, by taking unduly prejudicial and deceptive photographs of feces for use in the malicious prosecution against Plaintiff.

69.     Tellingly, on the date of the alleged incident, Defendant HATIN wrote a report stating that he was going to file felony charges against Plaintiff for allegedly kicking toilet water onto guards in the "B-Pod" section of the jail, which is not where the purported kicking of the

water is alleged to have occurred (it was alleged that Plaintiff kicked the water in the "Linear A" section of the jail), thus evincing the fact that he made a *predetermination* to file these false charges against Plaintiff before he even knew what the purported facts were and without conducting any legitimate investigation at all.

70.     Although Defendant HATIN claimed that he conducted interviews and took statements from the corrections officer witnesses the following day, on January 24, 2014, *i.e.*, one day *after* he had made the predetermination to file felony-level charges against Plaintiff, it appears that he (or someone else at the SHERIFF'S Department) simply instructed the officers to copy and paste their jail Unusual Incident reports onto boilerplate affidavit forms instead. In light of the foregoing, it is very likely that Defendant HATIN never conducted any interviews at all with regard to this matter, nor did he ever at any time attempt to take Plaintiff's statement or hear Plaintiff's side of the story, or that of any other inmate witnesses who were in Plaintiff's cell area at the time. For example, it would have been impossible for these officers to haver seen Plaintiff kick the water from where they were standing on the outside of the closed cell door in "Linear-A". Defendant HATIN admittedly never even checked to see if it were possible, nor could he possibly have done so in light of the fact that he still didn't even know in which section of the jail the alleged incident had occurred prior to making the predetermination to file false charges against Plaintiff.

71.     On January 24, 2014, Defendant HATIN filed two felony complaints against Plaintiff for alleged violations of Penal Law § 240.32 with the Queensbury Town Court. No supporting depositions were attached.

72.     Plaintiff was immediately arraigned on the felony complaints and prohibitively high bail was set for the new charges, preventing plaintiff from being able to be released on the

drug charges. Plaintiff served the DAO with a notice that he wished to testify on his own behalf at the Grand Jury for the new charges.

73.     Based upon the scant information available to him at the time, and specifically the fact that the conclusory felony complaints failed to give him proper notice of what he was being falsely accused by these officers, Plaintiff did not initially realize that these officers were intentionally trying to frame him. He did not believe that these local correctional officers, some of whom he had known for years and with whom he had never had a problem (including Defendant MADAY (a/k/a CHARLENE WELLS) and Defendant CO SPRING) would intentionally frame him on false criminal charges, so he innocently was forced to consider the possibility that perhaps the officers were mistaken, and if anything, it was the hostile SHERIFF'S Department that was trying to frame him and put words into their mouths. It wasn't until Plaintiff received Defendant CO SPRING's "Victim Impact Statement" in April 2014, falsely stating that Plaintiff kicked water onto the officers, "not once but twice," that Plaintiff realized he had been intentionally and maliciously framed by these officers.

74.     Defendant BURIN, the Warren County First Assistant District Attorney, intentionally undermined Plaintiff's testimony before the Grand Jury by repeatedly badgering and arguing with Plaintiff, making improper, extraneous remarks in response to said testimony, exceeding the limits of proper cross examination and otherwise abusing his quasi-judicial status by not acting in a fair, impartial and disinterested manner.

75.     Upon information and belief, Defendant BURIN had the court reporter alter the transcripts to make it appear as though Plaintiff made an admission of guilt before the Grand Jury.

76.     Defendant BURIN presented false and perjured material and immaterial testimonies from the Defendant officers, and other County employees before the Grand Jury. He

even suborned the janitor from Defendant SHERIFF to testify falsely, in order to undermine Plaintiff's account that his cell was freezing, that the air being discharged into Plaintiff's Linear-A cell on the day in question was somewhere in between 73° F and 95° F, neglecting to inform the Grand Jury that this was based upon a computer printout of what the temperatures were in the Linear-B section of the jail, not Linear A where Plaintiff was.

77.    Defendant PERILLI falsely testified at the Grand Jury, perjuriously claiming that he warned Plaintiff up to ten times to uncover his head before he ultimately requested and received permission from Defendant SGT. SPRING to take it. More specifically, Defendant PERILLI perjuriously testified that that Plaintiff *covered* and *uncovered* his head with his blanket eight to ten times, with his allegedly warning Plaintiff not to cover his head each time anew, before he ultimately requested and received permission from Defendant SGT. SPRING to enter Plaintiff's cell and take his blanket. However, this perjured testimony was no longer viable by the time of Plaintiff's first trial, as it had already been proven that PERILLI entered the B-Pod housing unit at 9:14 AM but also entered Plaintiff's cell and seized his blanket at 9:14 AM, making it impossible for him to have warned Plaintiff eight to ten times, contacted his sergeant, obtained permission from his sergeant to enter the cell, and then entered the cell and took the blanket, all within one minute. As a result of the foregoing, Defendant PERILLI was forced to change his story at trial and alleged for the first time that Plaintiff only covered and uncovered his head *one time* before he entered the cell to take his blanket, not eight to ten times as he had alleged at the Grand Jury.

78.    The aforementioned inconsistencies demonstrate that Defendant PERILLI was lying to both the Grand Jury *and the trial jury* as to his true reasoning and motivations for taking Plaintiff's blanket, and that he only changed his story at trial because he recognized the absurdity of his incredibly false claim that he ordered Plaintiff eight to ten times to uncover his head, with

Plaintiff initially complying and then re-covering his head each time anew, contacted Defendant SGT. SPRING, obtained permission to enter Plaintiff's cell and then entered Plaintiff's cell and then took his blanket, all within that 9:14 AM minute. This perjured testimony was crucially significant in light of the fact that the withholding and denial of Plaintiff's blanket (his only means of sheltering himself from the tortuously cold air) was a central theme all throughout the entire narrative, and had the Grand Jury known the truth about the pretext for denying Plaintiff the blanket, it would have significantly undermined the credibility of the other defendant officers and caused the Grand Jury to view the events of the day in a whole new light, to the effect that it was actually Plaintiff who was being targeted for abuse and harassment by the Defendant officers.

79.     Defendants SGT. SPRING, his brother CO SPRING, MADAY (a/k/a CHARLENE WELLS) and HUBBARD each also perjured themselves before that same Grand Jury. These Defendant officers falsely testified that Plaintiff kicked the contaminated water, urine and feces onto CO SPRING and MADAY (a/k/a CHARLENE WELLS) with his left foot immediately after the officers had exited Plaintiff's cell and secured the door shut behind them, with Plaintiff still inside the cell, and while both officers were standing on the opposite side of the closed cell door. They each later changed their stories at the subsequent trials, now claiming the door was open when Plaintiff allegedly kicked the water onto them. SGT. SPRING then finally conceded at Plaintiff's re-trial that he never saw Plaintiff kick the water at all. HUBBARD also changed his testimony, boldly admitting that he had lied at the Grand Jury, and now claiming that the officers were *inside* of Plaintiff's cell when plaintiff allegedly kicked the water onto them, and that after the door to the cell was closed, instead of kicking water onto the officers, as had been testified to by all four of these Defendant officers at the Grand Jury, Plaintiff returned to his bunk and began

scraping his wrist against the metal desk in his cell. He then changed his testimony yet again at the re-trial, now claiming that Plaintiff kicked the water with his *right* foot, not the left.

80.     Plaintiff was arraigned in Warren County Court shortly after the Grand Jury returned a two-count indictment (one count for allegedly kicking toilet water onto Defendant MADAY (a/k/a CHARLENE WELLS), and the second count for allegedly kicking toilet water onto DEFENDANT CO SPRING), with prohibitively high bail again being set.

81.     At this point, Plaintiff had still not been indicted in the drug possession case. A preliminary hearing was scheduled in that matter for April 4, 2014. Since Defendant BURIN refused to appear for the hearing, Plaintiff was released on his own recognizance on the drug possession charges. However, because of the prohibitively high bail set in the fabricated aggravated harassment of an employee by an inmate charges, Plaintiff continued to be incarcerated at the Warren County jail, as well as for a four-year old misdemeanor charge subsequently dismissed when the underlying penal law statute was declared to be unconstitutional.[3]

82.     Plaintiff was wrongly convicted of both false counts of aggravated harassment of an employee by an inmate following a trial on August 8, 2014. These wrongful convictions were brough about by the fabrications of Defendant officers, the sham investigation by Defendant HATIN (including but not limited to his failure to preserve exculpatory evidence), a large and orchestrated conspiracy and cover-up spearheaded by DAO, two missing witnesses (neither of the SPRING Defendants testified at the August 2014 trial due to an alleged illness in the family, thus resulting in Plainitff being deprived of his crucial right to confront and cross-examine his accusers, and also resulting in his inability to introduce crucial exculpatory evidence that could only be

---

3 The invalid misdemeanor charge was subject to dismissal in any event, *inter alia*, for facial insufficiency and speedy trial violations. But for the false aggravated harassment of an employee by inmate charges, Plaintiff would have been entitled to an immediate release on the misdemeanor charge pursuant to NYS PL §30.30(2)(b).

brought into the trial through the cross-examination of these two missing witnesses), ineffective assistance of counsel and reversible error by the court, including but not limited to being unconstitutionally deprived of his right to proceed *pro se*.

83.     Plaintiff was sentenced on August 13, 2014 to two consecutive 2 ½ to 5-year terms of imprisonment, for an aggregate sentence of five to ten years,[4] with over $5,000 worth of various fines and fees that were maliciously attached to his state prison inmate account, at a time when Plaintiff was indigent.

84.     At Plaintiff's sentencing, Defendant BURIN incredibly suggested on the record in front of a room filled with corrections officers that it would had been appropriate for corrections officers to have killed Plaintiff and covered up his murder by falsifying official documents and records, stating "Gee, Mr. Poulos actually fell down a flight of stairs."

85.     This unconscionable tirade constitutes irrefutable evidence of Defendant BURIN's actual malice and clearly indicated that DAO and Defendant COUNTY tolerated and encouraged official misconduct, perjury, and falsification of documents and records by SHERIFF's Department employees.

86.     Approximately one day after Plaintiff was sentenced to ten years for the fabricated aggravated harassment of an employee by an inmate charges, the Warren County Court pretextually released Plaintiff on his own recognizance in the drug possession case that was still pending at the time, so that, *inter alia*, Plaintiff would lose his crucial pretrial detainee status in that case and be transferred to the more restrictive New York State prison system, which ultimately resulted in Plaintiff unduly being tried as a state convict in the drug case nearly two years later. This resulted in an additional seizure and tremendous loss of liberty for Plaintiff.

---

4 The DAO was forced to concede in its brief at the appellate level that the consecutive sentences were illegally imposed, thus resulting in Plaintiff having been subjected to *double* the maximum legal aggregate sentence.

87.     The day before Plaintiff was sent to state prison, Captain Albert Maday, Defendant MADAY (a/k/a CHARLENE WELLS)'s uncle, came to Plaintiff's cell and admitted that Plaintiff had been set up for allegedly kicking toilet water at his niece and others, stating. "You never should have shit on the floor, Tyson."

88.     Plaintiff was transferred to the custody of the New York State prison system on August 21, 2014, where he has remained ever since.

89.     The sole basis for Plaintiff's custody and wrongful imprisonment in the New York State prison system at that time were his wrongful convictions for aggravated harassment of an employee by an inmate.

90.     The conditions in the generally much harsher and more restrictive New York State prison system were atypical and significantly harsher for Plaintiff and those extremely harsher, more restrictive, atypical conditions were not at all conducive to Plaintiff being able to receive a fair trial in the drug case that was then still pending at the trial court level. These conditions were rendered even more harsh by the fact that the Warren County Court had imposed and attached over $5,000 worth of various fines and fees against Plaintiff's New York State prison system inmate account, so that all funds sent to Plaintiff, who was indigent, would be seized and sent to the Defendant COUNTY.

91.     As a result of the above, Plaintiff went two entire years without being able to purchase even so much as rudimentary hygiene products, such as deodorant or shower slippers, or even stamps, which prevented Plaintiff from being able to communicate and maintain contact with his family. The excessive fines and fees also prevented him from being able to purchase food so that he could properly nourish his body and maintain his health, so that Plainitff starved most of the time and became borderline diabetic.

92.     At the same time, Plaintiff's essentially untreated and neglected agoraphobia and social anxiety disorder were significantly exacerbated by the conditions rampant at DOCCS prisons, which by itself made it nearly impossible for Plaintiff to be able to function in DOCCS' general population, so that he spent virtually all of his time isolated and *incommunicado* in DOCCS solitary confinement.

93.     Moreover, as a result of the false aggravated harassment of an employee by an inmate charges for which Plaintiff was confined to prison, he had a constant target on his back and was subjected to extreme violence and beatings by prison guards.

94.     Plaintiff was tried on the drug charges case as a convict and state prisoner as opposed to being a pretrial detainee in a local jail, or a bailed or released on recognizance defendant, while he was being held incommunicado in DOCCS solitary confinement.

95.     Plaintiff was found guilty of the drug charges and sentenced to 33 years, to run consecutively to the sentence in the aggravated harassment case, for an aggregate of 43 consecutive years of imprisonment.

96.     Plaintiff's injuries and damages stemming from the instant claims were then perpetuated and compounded exponentially when the Warren County Court allowed the prosecutor to impeach Plaintiff's credibility in the drug case based upon his wrongful convictions for aggravated harassment of an employee by an inmate (which were then still pending on appeal), which was extremely prejudicial to Plaintiff. Further, the County Court explicitly based the outrageous 33-year prison sentence in the drug case in part upon Plaintiff's wrongful conviction in the instant matter.

97.     Six months after Plaintiff's conviction in the drug case, in a unanimous decision dated November 23, 2016, the Appellate Division, Third Department reversed plaintiff's

convictions for aggravated harassment of an employee by an inmate, remanding the matter to the Warren County Court for a new trial. The Appellate Division held that Plaintiff had been deprived of his right to proceed *pro se* at trial, and that a missing evidence charge should have been given. Numerous other reversible errors were rendered academic by the reversal and remand.

98.     At the new trial, the same judge once again unconstitutionally refused to allow Plaintiff to proceed *pro se*, forcing plaintiff to have to expend over $40,000 for legal representation. Plainitff was represented by Norman Steiner, Esq. of Brooklyn, New York, who found that Plaintiff had been harassed, abused and framed at the hands of the Warren County SHERIFF'S Department and that Plaintiff was the victim of a cover-up and misconduct by the Warren County Court, Warren County SHERIFF'S Department and DAO.

99.     Attorney Steiner relayed his grave concerns to the Warren County District Attorney via a letter dated July 31, 2017, but the District Attorney, deliberately indifferent at best, took no action to rectify the situation, and the malicious prosecution of Plaintiff continued.

100.    A second trial was held in the matter of the aggravated harassment of an employee by inmate charges, resulting in a "not guilty" verdict and acquittal on all charges on January 29, 2018.

101.    A set forth above, Defendants lacked probable cause to initiate, maintain and continue this malicious prosecution.

102.    As set forth above, Defendants acted, under color of law, with purposeful and malicious intent to cause harm to Plaintiff.

103.    As set forth above, Defendants' actions were malicious in the instance and were motivated by reasons other than to secure justice.

104.    As set forth above, Defendants have made every effort to conceal then truth about what actually occurred, including, but not limited to, covering up, or attempting to cover up, the illegal conduct complained of herein.

105.    In furtherance of the conspiracy, cover-up and malicious prosecution of Plaintiff, none of the Defendant officers truthfully reported what they did, saw and heard. Instead, they convened amongst themselves, and other agents, instrumentalities, officers and/or employees of Defendant COUNTY to fabricate a story to falsely justify the malicious prosecution of Plaintiff. Although the Defendant officers knew it was untrue, they agreed to falsely report that Plaintiff's blanket had been taken by Defendant PERILLI because Plaintiff repeatedly used it to cover his head, that Plaintiff sought to get even by kicking urine, feces and toilet water onto Defendants MADAY (a/k/a CHARLENE WELLS) and CO SPRING, and that these Defendants laundered their allegedly soiled garments before Defendant HATIN arrived.

106.    In furtherance of the conspiracy, cover-up and malicious prosecution, the Defendants, individually and collectively, conspired to create false reports, statements and logbook entries that they knew to be false or misleading.

107.    In furtherance of the conspiracy, cover-up and malicious prosecution, the Defendant officers and Defendant HATIN intentionally gave false testimony against Plaintiff on numerous occasions.

108.    In furtherance of the conspiracy, cover-up and malicious prosecution, Defendant HATIN conducted a sham investigation, failed to preserve exculpatory evidence, failed to interview Plaintiff or any other inmate witnesses, failed to see if it were even *possible* for Defendants officers to have seen Plaintiff kick the water through the closed cell door from where they were standing, failed to check the officers; stories for inconsistencies, made the

*predetermination* to press false felony-level charges against Plaintiff before interviewing the Defendant officers and before he even knew where in the jail the alleged crime was alleged to have occurred, and otherwise aided, abetted and conspired with, *inter alia*, the Defendant officers to frame Plaintiff for these false criminal charges.

109.    Defendant BURIN conspired with the other Defendants to maliciously prosecute Plaintiff and to cover up what actually occurred, suborned and willfully utilized perjured testimony and documents in furtherance of the malicious prosecution, abused his quasi-judicial status at the Grand Jury by not acting in a fair, impartial and disinterested manner, enlisted his stenographer to alter the Grand Jury transcripts, and otherwise aided and abetted the conspiracy  at every level, including the pre-indictment, investigatory level.

110.    The Defendant County, through its policies, practices, customs, usages, agencies, agents, instrumentalities and employees, supported this malicious prosecution against Plaintiff at every level, and aided and abetted the conspiracy at every stage thereof.

111.    The foresaid misconduct was part of a widespread practice in Defendant COUNTY that, although not formally authorized, constituted a well-settled custom or usage of which these Defendants, their superiors, and the municipal policy makers were all actively aware and complicit in.

112.    On every occasion alleged herein, the Defendants acted with deliberate indifference towards Plaintiff's clearly established constitutional rights.

113.    The aforesaid acts and omissions clearly violated Plaintiff's clearly established right secured by the United States Constitution and were the direct and proximate cause of the injuries and damages he suffered.

114.     Said Defendants are liable for their complicity in fabricating false and/or intentionally misleading official documents, reports, charges and records, in furtherance of, and precipitating, the malicious prosecution.

115.     By reason of the foregoing, the Defendants violated the liberty and property interest of the Plaintiff, in violation of his First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment rights.

## FIRST CAUSE OF ACTION FOR MALICIOUS PROSECUTION

116.     The Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" to "115" above as if set forth in full herein.

117.     By virtue of the above, a criminal proceeding on two charges of aggravated harassment of an employee by an inmate (Penal Law § 240.32), a class E felony, was commenced on or about January 24, 2014 against the Plaintiff.

118.     By virtue of the above, the proceeding terminated in favor of the Plaintiff on January 29, 2018.

119.     By virtue of the above, in light of the fact that the charged conduct never occurred at all, and that the action was supported only by lies, perjury, deceit, fraudulently composed and altered documents and conspiracy to do the same, there was no probable cause to initiate said action.

120.     By virtue of the above, the proceeding was commenced and continued with actual malice, in that it was based upon wrong and improper motives, and something other than the desire to see the ends of justice served.

121.     By virtue of the above, the Defendants have engaged in malicious prosecution.

122.    As a result of the above, Plaintiff TYSON POULOS has been damaged, such damages including, but not limited to, wrongful confinement, false imprisonment, solitary confinement, loss of liberty, a perpetual state of fear, anxiety, suicidal thoughts, emotional distress, post-traumatic stress disorder, exacerbation of agoraphobia and social anxiety disorder, malnutrition, starvation, poor and deficient medical care, physical injuries, deprivation of the ability to communicate and maintain contact with family, repeated violence by prison personnel, threats of violence by prison personnel (including threats of death), economic damages, loss of past and future income, loss of business opportunities, permanent impairment of earning capacity, excessive legal fees, and violation of Plaintiff's constitutional rights under the First, Fifth, Sixth, Eighth and Fourteenth Amendments, all without any fault on the part of the Plaintiff TYSON POULOS herein, and has been otherwise damaged in a substantial sum of money, said sum to be determined by a court and jury.

123.    As a result of the foregoing, Plaintiff is entitled to an award of compensatory damages against all Defendants, punitive damages against the non-municipal Defendants, and reasonable attorney's fees, together with costs, expert fees, and disbursements pursuant to 42 U.S.C. §1988.

## SECOND CAUSE OF ACTION FOR FALSE IMPRISONMENT

124.    The Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" to "123" above as if set forth in full herein.

125.    By virtue of the above, the Defendants intended to confine the Plaintiff herein.

126.    By virtue of the above, the Plaintiff was aware that he was being confined.

127.    By virtue of the above, the Plaintiff did not consent to the confinement.

128.    By virtue of the above, the confinement was not otherwise privileged.

129.    By virtue of the above, the Defendants have falsely imprisoned the Plaintiff.

130.    As a result of the above, Plaintiff TYSON POULOS has been damaged, such damages including, but not limited to, wrongful confinement, false imprisonment, solitary confinement, loss of liberty, a perpetual state of fear, anxiety, suicidal thoughts, emotional distress, post-traumatic stress disorder, exacerbation of agoraphobia and social anxiety disorder, malnutrition, starvation, poor and deficient medical care, physical injuries, deprivation of the ability to communicate and maintain contact with family, repeated violence by prison personnel, threats of violence by prison personnel (including threats of death), economic damages, loss of past and future income, loss of business opportunities, permanent impairment of earning capacity, excessive legal fees, and violation of Plaintiff's constitutional rights under the First, Fifth, Sixth, Eighth and Fourteenth Amendments, all without any fault on the part of the Plaintiff TYSON POULOS herein, and has been otherwise damaged in a substantial sum of money, said sum to be determined by a court and jury.

131.    As a result of the foregoing, Plaintiff is entitled to an award of compensatory damages against all Defendants, punitive damages against the non-municipal Defendants, and reasonable attorney's fees, together with costs, expert fees, and disbursements pursuant to 42 U.S.C. §1988.

### THIRD CAUSE OF ACTION PURSUANT TO *MONELL* UNDER 42 U.S.C. §1983

132.    The Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" to "131" above as if set forth in full herein.

133.    As set forth above, the defendants, acting under the color of law, violated Plaintiff's First, Fifth, Sixth, Eighth and Fourteenth Amendment rights in that they (a) violated Plaintiff's due process rights at trial; (b) abused and misused their authority; (c) maliciously prosecuted Plaintiff;

(d) conspired with to procure and/or develop perjurious testimony in order to ensure the plaintiff's charging, arrest, and conviction; (e) conspired amongst themselves to maliciously prosecute Plaintiff out of their own personal interest; (f) prosecuted Plaintiff by presenting knowingly perjured testimony to the Court; (g) were deliberately indifferent to Plaintiff's civil and due process rights; (h) failed to protect Plaintiff in the instance; (i) failed to intervene, mitigate and/or stop the misconduct and abuses alleged herein; (j) knowingly misled and/or provided false statements to the Court and Plaintiff in an effort to prevent the truth from coming to light, all with purposeful intent to harm to Plaintiff; and (k) failed to disclose *Brady* and *Rosario* material to Plaintiff.

134.   Defendant WARREN COUNTY, by and through its policymakers, including WARREN COUNTY SHERIFF'S DEPARTMENT and WARREN COUNTY DISTRICT ATTORNEY'S OFFICE, knew of, condoned, and intended the unlawful conduct alleged herein.

135.   Supervisory personnel within WARREN COUNTY SHERIFF'S DEPARTMENT, including but not limited to captain, lieutenants and sergeants, failed to take appropriate action in the instance.

136.   Supervisory personnel within WARREN COUNTY DISTRICT ATTORNEY'S OFFICE, including but not limited to District Attorneys Hogan and Carusone, DAO's Bureau Chiefs and Assistant Bureau Chiefs, failed to take appropriate action in the instance.

137.   Defendant WARREN COUNTY, by and through WARREN COUNTY SHERIFF'S DEPARTMENT and WARREN COUNTY DISTRICT ATTORNEY'S OFFICE, acted with deliberate indifference to the plaintiff's civil rights, right to a fair trial, and due process rights.

138.    As a direct and proximate result of Defendant WARREN COUNTY's deliberate indifference, by and through WARREN COUNTY SHERIFF'S DEPARTMENT and WARREN COUNTY DISTRICT ATTORNEY'S OFFICE, Plaintiff suffered the damages aforesaid.

139.    As set forth above, Defendant WARREN COUNTY, by and through WARREN COUNTY SHERIFF'S DEPARTMENT and WARREN COUNTY DISTRICT ATTORNEY'S OFFICE, has made every effort to conceal the truth about the circumstances that led to the defendant officers changing their story, when/how/why it occurred, and, upon information and belief, submitted false reports, providing inaccurate, incomplete and/or untruthful written statements to the Court, investigators and disciplinary committees.

140.    Defendant WARREN COUNTY, by and through its supervisory personnel at WARREN COUNTY SHERIFF'S DEPARTMENT and WARREN COUNTY DISTRICT ATTORNEY'S OFFICE, had first-hand knowledge of or, had they diligently exercised their duties to train, retrain, supervise and control their officers, sergeants, investigators, and assistant district attorneys on a continuing basis should have had such knowledge, that the unlawful and unconstitutional acts alleged herein were going to be committed and were being committed.

141.    For example, upon information and belief, ADA Burin consulted with his supervisor(s) at some point after becoming aware that the defendant officers' testimony would be different from their official reports and/or prior testimony, for the purpose of determining whether to provide this information to Plaintiff and his defense counsel, and that said supervisor(s) decided it was not *Brady* or *Rosario* material nor were they otherwise required to disclose same. As a supervisor, they had the power, authority and duty to prevent or aid in preventing the commission of the wrongs alleged, could have done so, and intentionally, knowingly, recklessly and/or with deliberate indifference to the rights of the plaintiff failed to do so.

142.    Defendant WARREN COUNTY, by and through its policymakers and supervisory personnel at WARREN COUNTY SHERIFF'S DEPARTMENT and WARREN COUNTY DISTRICT ATTORNEY'S OFFICE, failed to maintain an adequate structure for monitoring their employees.

143.    The individual defendants engaged in conduct that constitutes a custom, usage, practice, procedure or rule of WARREN COUNTY SHERIFF'S DEPARTMENT and WARREN COUNTY DISTRICT ATTORNEY'S OFFICE, but which is forbidden by the Constitution of the United States.

144.    Prior to the relevant dates, Defendant WARREN COUNTY, by and through its policymakers and supervisory personnel at WARREN COUNTY SHERIFF'S DEPARTMENT and WARREN COUNTY DISTRICT ATTORNEY'S OFFICE, developed and maintained customs, policies, usages, practices, procedures and rules exhibiting deliberate indifference to the due process and constitutional rights of the individuals they incarcerate and prosecute, their *Brady*, *Rosario* and other obligations during prosecutions, their duties and sworn oaths as prosecutors and peace officers, the ABA Standards for Criminal Justice, and the New York Rules of Professional Conduct, which caused the violations of the plaintiff's rights.

145.    Prior to the relevant dates, DAO officials instructed and trained their employees and staff not to turn over *Brady* and *Rosario* material to defense counsel as/when provided by the Criminal Procedure Law, but rather in accordance with their own internal practices, which caused the violations of the plaintiff's rights.

146.    Prior to the relevant dates, SHERIFF's Department officials instructed and trained their employees and staff to turn a blind eye to officer-on-staff abuse, staff misconduct, and falsified official records, which caused the violations of the plaintiff's rights.

147.    Likewise, prior to the relevant dates, DAO officials have, upon information and belief, instructed and trained their employees and staff not to document communications with investigators, victims and witnesses, not to take notes during these communications, not to document the information elicited during these communications, not to record these communications, and not to communicate with these individuals in writing so as not to create material potentially discoverable to the defense, thereby permitting the assistant district attorneys to act with relative impunity, which caused the violations of the plaintiff's rights.

148.    Likewise, prior to the relevant dates, SHERIFF's Department officials have, upon information and belief, instructed and trained their employees and staff not to heartily investigate claims of staff abuse or misconduct, falsified official records, or perjurious official statements or testimony by staff, thereby permitting the defendant officers to act with relative impunity, which caused the violations of the plaintiff's rights.

149.    The long-standing failure or refusal of Defendant WARREN COUNTY, by and through WARREN COUNTY SHERIFF'S DEPARTMENT and WARREN COUNTY DISTRICT ATTORNEY'S OFFICE, to supervise the employees under said defendant's control, including supervisory staff, is now so institutionalized as to constitute a policy or custom of tolerating and authorizing the type of abuse and misconduct alleged herein. It is this policy or custom of abuse and cover-up that has caused the deprivation of the plaintiff's rights.

150.    Said defendant's policy or custom of tolerating and authorizing this type of abuse is further evidenced by frequent and significant findings of misconduct over a period of years by supervisors and the prosecutors they supervise.

151.    The failures and refusals to hold these supervisors and prosecutors accountable is a proximate cause of the injuries sustained by the plaintiff, and undoubtedly hundreds of other persons.

152.    The pattern of unchecked abuse by correctional staff and prosecutors, the extent to which these unlawful practices have been adopted by significant numbers of the staff, and the persistent failure or refusal of County officials to supervise these persons properly and to take action to curb the misconduct, demonstrates a policy of deliberate indifference which tacitly authorizes the unconstitutional conduct claimed by Plaintiff

153.    The foregoing customs, policies, usages, practices, procedures and rules constituted deliberate indifference to the safety, freedom, and constitutional rights of the plaintiff.

154.    The foregoing customs, policies, usages, practices, procedures and rules were the direct and proximate cause of the constitutional violations suffered by Plaintiff.

155.    The foregoing customs, policies, usages, practices, procedures and rules were the moving force behind the constitutional violations suffered by Plaintiff.

156.    The pattern of misconduct alleged herein has been expressly and/or implicitly condoned by ranking officials and supervisors with Defendant WARREN COUNTY, by and through its WARREN COUNTY SHERIFF'S DEPARTMENT and WARREN COUNTY DISTRICT ATTORNEY'S OFFICE, who have been or are aware of the number, frequency, and severity of these incidents and of the continuing risk posed to the public. The fact that these abuses remain unchecked and unrestrained leads to the perception that prosecutors, supervisors and staff may act with impunity.

157.    The Defendant WARREN COUNTY, by and through its policymakers, including WARREN COUNTY SHERIFF'S DEPARTMENT and WARREN COUNTY DISTRICT

ATTORNEY'S OFFICE, created, promulgated and maintained an official policy, perpetuated by custom and usage, of failing to properly hire, train, monitor and supervise their employees and/or agents and/or servants to avoid violation of the constitutional rights of the public at large, and of Plaintiff in particular, evidencing deliberate indifference to those rights.

158.    The hiring, training, monitoring and supervisory procedures of Defendant WARREN COUNTY and of WARREN COUNTY SHERIFF'S DEPARTMENT and WARREN COUNTY DISTRICT ATTORNEY'S OFFICE were inadequate to prevent said constitutional violations, resulting in violation of Plaintiff's constitutional rights pursuant to the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments.

159.    The execution of the policy of Defendant WARREN COUNTY and of WARREN COUNTY SHERIFF'S DEPARTMENT and WARREN COUNTY DISTRICT ATTORNEY'S OFFICE by their employees and/or agents and/or servants resulted in violation of Plaintiff's constitutional rights pursuant to the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments.

160.    The Defendant WARREN COUNTY and WARREN COUNTY SHERIFF'S DEPARTMENT and WARREN COUNTY DISTRICT ATTORNEY'S OFFICE had actual and/or constructive knowledge of said constitutional violations and failed to take adequate measures to correct said policies, effectively acquiescing to said conduct and constitutional violations.

161.    The failure of Defendant WARREN COUNTY and of WARREN COUNTY SHERIFF'S DEPARTMENT and WARREN COUNTY DISTRICT ATTORNEY'S OFFICE to investigate and discipline those employees and/or agents and/or servants responsible for said constitutional violations constitutes a custom and usage evidencing deliberate indifference to the constitutional rights of the public at large, and of Plaintiff in particular.

162.   Defendant WARREN COUNTY and WARREN COUNTY SHERIFF'S DEPARTMENT, by way of official policy and custom and usage, failed to properly hire, train, monitor and supervise their employees and/or agents and/or servants, resulting in the use of excessive force, false imprisonment, inadequate investigation of incidents between inmates and corrections officers, fabrication and condoning fabrication of false testimony, improper processing of evidence, threatening witnesses, engaging in verbal and physical abuse, harassment, and entrapment, all resulting in violation of Plaintiff's constitutional rights pursuant to the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments.

163.   Defendant WARREN COUNTY and WARREN COUNTY DISTRICT ATTORNEY'S OFFICE, by way of official policy and custom and usage, failed to properly hire, train, supervise and monitor their employees and/or agents and/or servants, resulting in inadequate investigation, prosecutorial misconduct, submission of perjured testimony, subornation of perjury, publicly condoning violence by corrections officers, publicly condoning perjury, fabrication and condoning fabrication of false testimony, threatening witnesses, and failing to preserve exculpatory  , all resulting in violation of Plaintiff's constitutional rights pursuant to the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments.

164.   The aforesaid acts and omissions violated Plaintiff's clearly-established constitutional rights and were the direct and proximate cause of damages suffered by Plaintiff.

165.   As a result of the foregoing, Plaintiff is entitled to an award of compensatory damages and reasonable attorney's fees, together with costs, expert fees, and disbursements pursuant to 42 U.S.C. §1988.

## FOURTH CAUSE OF ACTION FOR FALSIFICATION OF EVIDENCE AND SPOLIATION OF EVIDENCE

166.    The Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" to "165" above as if set forth in full herein.

167.    The Defendants, taken collectively, had a duty to preserve evidence concerning the incident at the Budget Inn Motel in Queensbury, New York, on or about January 20, 2014, and the incident at Warren County Jail on or about January 23, 2014, both inculpatory and exculpatory, which evidence was in their possession and control.

168.    The Defendants collectively lost and/or destroyed and/or altered and/or falsified said evidence due to recklessness, gross negligence and/or maliciously intent to do so.

169.    Some of the above evidence, *e.g.*, articles of corrections officers' clothing, was relevant to Plaintiff's defense in that they would have shown that the criminal acts charged did not occur.

170.    As a result of the above, the Defendants collectively falsified and spoliated evidence, all resulting in violation of Plaintiff's constitutional rights pursuant to the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments.

171.    As a result of the foregoing, Plaintiff is entitled to an award of compensatory damages against all Defendants, punitive damages against the non-municipal Defendants, and reasonable attorney's fees, together with costs, expert fees, and disbursements pursuant to 42 U.S.C. §1988.

## FIFTH CAUSE OF ACTION FOR DEPRIVATION OF A FAIR TRIAL

172.    The Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" to "171" above as if set forth in full herein.

173.    By virtue of the above falsification and spoliation of evidence, as well as the aforesaid prosecutorial misconduct, submission of perjured testimony by the prosecutor and to a jury that was likely to be influenced by said false and/or spoliated evidence, subornation of perjury, publicly condoning violence by corrections officers, publicly condoning perjury, fabrication and condoning fabrication of false testimony and threatening witnesses, Defendants collectively deprived Plaintiff of a fair trial on or about August 8, 2014 and at a later trial on drug charges, all resulting in violation of Plaintiff's constitutional rights pursuant to the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments.

174.    As a result of the foregoing, Plaintiff is entitled to an award of compensatory damages against all Defendants, punitive damages against the non-municipal Defendants, and reasonable attorney's fees, together with costs, expert fees, and disbursements pursuant to 42 U.S.C. §1988.

## DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

**WHEREFORE**, Plaintiff TYSON POULOS demands judgment against the Defendants, and each of them, in amounts which exceed the jurisdictional limits of all lower Courts that might otherwise have jurisdiction over this matter, on the First, Second, Third, Fourth, and Fifth Causes of Action alleged herein, in an amount to be determined by the trier of fact but in no event less than $10,000,000.00, together with punitive damages, costs, interest and disbursements of this action, and such other relief as a court would find fair and just.

Dated: Brooklyn, New York
         March 26, 2021

Yours, etc.,

*/s/ Philip Hines*_____
Philip M. Hines, Esq.
HELD & HINES, LLP
*Attorneys for Plaintiff*
2004 Ralph Avenue
Brooklyn, New York 11234
(718) 531-9700
phines@heldhines.com